UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| vs. | : | CRIMINAL NO.  3:19-CR-254 (KAD) |
| MICHELLE GSCHLECHT | : | January 31, 2020 |

**MEMORANDUM IN SUPPORT OF MOTION TO SUPPRESS**

**TABLE OF CONTENTS**

STATEMENT OF FACTS ...............................................................................................2

ARGUMENT ...............................................................................................................4

I. THE GOVERNMENT BEARS THE BURDEN OF JUSTIFYING THE SEARCH................................................4

II. THE "CONSENT" PROVIDED IN THE COMPUTER ACCESS AGREEMENT IS NOT VOLUNTARY AND CARRIES NO WEIGHT..................................................................................................5

III. THE "COMPUTER ACCESS AGREEMENT" DOES NOT APPLY TO CELLPHONES.................................7

IV. AS A CONDITION OF PROBATION, THE SUSPICIONLESS SEARCH PROVISION IS UNCONSTITUTIONAL. ..................................................................................................10

IV. THE SEARCH WAS NOT OTHERWISE REASONABLE.....................................................18

CONCLUSION ...............................................................................................................18

Michele Gschlecht is charged with possession of child pornography. This allegation arises from an incident in which a Connecticut state Probation Officer approached Ms. Gschlecht on the New Haven green, seized a cellphone from her, and searched it. The Probation Officer did not have a warrant; however, Ms. Gschlecht was on Connecticut state probation and as a condition of her release from custody had signed a "Computer Access Agreement" that purportedly provides consent to suspicionless searches of any computer she may possess.

For the reasons that follow, notwithstanding this purported agreement there was no lawful authority for the warrantless search of the cellphone seized from Ms. Gschlecht for three reasons. First, Ms. Gschlecht's signing of the Computer Access Agreement was not a voluntary waiver. Second, the waiver did not clearly apply to cellphones. And third, suspicionless search conditions of the sort at issue here are unconstitutional. All evidence deriving from that search must therefore be suppressed pursuant to the Fourth Amendment to the United States Constitution.

**STATEMENT OF FACTS**

On July 14, 2015, a Connecticut Superior Court judge sentenced Michelle Gschlecht to a ten-year prison term suspended after five years, followed by 10 years of probation. **Exhibit 1**. Among the conditions of probation was an order stating: "DO NOT HAVE ANY UNAUTHORIZED ACCESS TO THE INTERNET AND COMPLY WITH THE PROBATION COMPUTER ACCESS AGREEMENT[.]" *Id*. The order of probation also includes a "notice to defendant" stating that "During your period of probation, if you do not follow the order below, the Court may issue a warrant for your arrest, revoke your probation and require you to serve the above sentence, or change the term or the conditions of your probation." *Id*.

On March 12, 2019, Ms. Gschlecht signed a "Probation Computer Access Agreement" as referenced in the July 14, 2015, judgment. **Exhibit 2**. The "Probation Computer Access Agreement"

provided to Ms. Gschlecht is a State of Connecticut form, "JD-CR-143 Rev. 1-07." *Id*. The latter

portion of this designation indicates that the form was last revised in January of 2007. Above Ms.

Gschlecht's signature is a typed statement indicating that "I have read, and the Probation Officer

has reviewed with me, the above checked conditions. I understand them, was provided a copy of

them, and will abide by them." *Id*. The form is also signed by a Probation Officer, but the form

shows that the Officer reviewed the conditions via video conference rather than in person. *Id*.

Among the conditions in the "Probation Computer Access Agreement" is that "I agree and

voluntarily consent to having my computer examined and/or searched at any time, announced or

unannounced, by Probation or its agent to verify compliance with the special conditions of my

probation[.]" *Id*.

Ms. Gschlecht began her term of probation on April 15, 2019. On July 31, 2019, her

supervising Probation Officer approached her on the New Haven Green. According to the HSI

report, the following events occurred:[1]

> On July 31, 2019, Probation Officers (PO) Chris Caporale and Patricia Belin from
> the State of CT Adult Probation Sex Offender Unit located in New Haven were traveling in
> the area of Church Street in New Haven and observed GSCHLECHT sitting on the Green
> with an unknown male. PO Caporale observed GSCHLECHT with what appeared to be a
> smart phone in his hand (AGENTS NOTE: Probation noted that at no time was
> GSCHLECHT given permission to possess a smart phone). PO Caporale then approached
> GSCHLECHT and asked GSCHLECHT to hand over the phone. A brief examination of the
> phone by PO Caporale revealed suspected child pornography images and videos in the photo
> gallery. Subsequently, the phone was confiscated by Probation and GSCHLECHT was
> transported back to the State of CT Adult Probation Sex Offender Unit for further
> investigation.

---

[1] For purposes of the present motion, Defendant submits the facts as set forth by law enforcement
and reserves the right to challenge these facts at a later date.
     Additionally, Defendant notes that the report quoted here refers to Ms. Gschlecht using male
pronouns. Ms. Gschlecht is a transgender woman who uses female pronouns.

On October 2, 2019 , the reporting Agent contacted PO Caporale who advised that during the encounter with GSCHLECHT on July 31, 2019, GSCHLECHT initially stated that the phone belonged to the unknown male , at which time the unknown male stated it was in fact GSCHLECHT's phone (AGENTS NOTE: Law enforcement subsequently fully identified the unknown male as Charles Ingham, DOB: [...]). PO Caporale further advised that at some point during the encounter, GSCHLECHT then admitted to PO Caporale that it was his phone.

**Exhibit 3**.

**ARGUMENT**

I.     **The Government Bears the Burden of Justifying the Search.**

With respect to personal "effects" such as a cell phone, "[t]he Fourth Amendment protects two different interests of the citizen – the interest in retaining possession of his property and the interest in maintaining personal privacy." *Colorado v. Bannister*, 449 U.S. 1, 3 (1980). "A seizure [of an object] threatens the former, a search the latter." *Id*. The Supreme Court has defined a "seizure" of property as occurring "when there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). Such interference occurs when police exercise "dominion and control" over property. *United States v. Segura*, 468 U.S. 796, 823 (1984). A "search," by contrast, "occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." *Jacobsen*, 466 U.S. at 113.

"In the ordinary case, the Court has viewed a seizure of personal property as *per se* unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursuant to a judicial warrant issued upon probable cause and particularly describing the items to be seized." *United States v. Place*, 462 U.S. 696, 701 (1983). Where, as here, law enforcement officers seize property without a warrant, it becomes the Government's burden to prove the existence of a recognized exception to the warrant requirement. *Coolidge v. New Hampshire*, 403 U.S. 443, 455

4

(1971) ("'[T]he burden is on those seeking the exemption to show the need for it.'" (quoting *United States v. Jeffers*, 342 U.S. 48, 51 (1951))).

The Second Circuit has further explained that:

> A warrantless search is *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions. In support of a motion to suppress evidence found in a warrantless search, the defendant must show that he had a reasonable expectation of privacy in the place or object searched. If such a privacy interest is established, the government has the burden of showing that the search was valid because it fell within one of the exceptions to the warrant requirement.

*United States v. Perea*, 986 F.2d 633, 639 (2d Cir. 1993) (citations and internal quotation marks omitted).

Additionally, "[w]hen a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given. This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority." *Bumper v. North Carolina*, 391 U.S. 543, 548–49 (1968) (footnote omitted).

Here, Ms. Gshlecht's Probation Officer's own account shows that when he approached her, Ms. Gschlecht was holding the phone at issue. EX. 1. She relinquished the phone only at his request and after an initial denial claimed ownership of the phone. *Id*. As the possessor of a personal effect, Ms. Gschlecht had a Fourth Amendment possessory and privacy interest in the phone. For the reasons that follow, the Government cannot meet its burden of showing the search of that phone was constitutional.

## II.    The "Consent" Provided in the Computer Access Agreement Is Not Voluntary and Carries No Weight.

In the spring of 2019, Ms. Gschlecht faced a choice that really was no choice at all. The judge who had sentenced her in 2014 expressly required, as a condition of probation, that she sign a "Probation Computer Access Agreement." As indicated in the judgment, failure to abide by the judge's condition could result in her reincarceration, potentially for the remaining five years of her

sentence. Only by signing that document could Ms. Gschlecht secure her freedom—it was the

ultimate contract of adhesion.

  The Supreme Court has made clear that "the Fourth and Fourteenth Amendments require

that a consent not be coerced, by explicit or implicit means, by implied threat or covert force. For,

no matter how subtly the coercion was applied, the resulting 'consent' would be no more than a

pretext for the unjustified police intrusion against which the Fourth Amendment is directed."

*Schneckloth v. Bustamonte*, 412 U.S. 218, 228 (1973).

  Applying this principle to facts similar to those here, a judge in the Western District of New

York has held that a consent form signed as a requirement for obtaining parole was not valid:

> When Coleman was given the 'agreement' to sign, parole had been granted. However parole
> is characterized, 'the liberty is valuable' and a return to a lifestyle approximating normalcy
> is cherished. *Morrissey v. Brewer* 408 U.S. 471, 482, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).
> See also *United States ex rel. Johnson v. New York State Board of Parole*, 500 F.2d 925 (2d
> Cir. 1974). Only Coleman's signature on the dotted line could secure the benefit of parole. A
> refusal to sign slammed the cell door shut until January 1977, more than eight years. (See
> Exhibit I, supra.) Under these circumstances, I find sufficient coercion present to invalidate
> the consent to search executed.

*U.S. ex rel. Coleman v. Smith*, 395 F. Supp. 1155, 1157 (W.D.N.Y. 1975).

  Contrary to this view, the Government argued in *United States v. Knights*, 534 U.S. 112

(2001), a case involving a suspicionless search probation condition, that "acceptance of the search

condition was voluntary because he had the option of rejecting probation and going to prison

instead, which the Government argues is analogous to the voluntary decision defendants often make

to waive their right to a trial and accept a plea bargain." *Id*. at 118. Notably the Supreme Court

declined to adopt the Government's view, leaving the issue open.

Just as in *Coleman*, Ms. Gschlecht's signature on the Computer Access Agreement was needed to secure her freedom, with five more years of prison as her only alternative. No real choice was available to her. The coercion inherent in the circumstances of Ms. Gschlecht's "agreement" was such that it was not an enforceable waiver of her otherwise applicable Fourth Amendment rights.

### III.    The "Computer Access Agreement" Does not Apply to Cellphones.

The agreement Ms. Gschlecht signed, moreover, did not by its own terms clearly apply to the cellular phone that the Probation Officer seized and searched. As noted above, the form at issue utilized language last updated in January of 2007—several months before the first generation iPhone debuted in late June of 2007.[2] The form unsurprisingly does not appear to contemplate the sort of sophisticated cellular phones that are now commonplace. Specifically, nothing in the form makes any reference to the use or possession of a cellphone, smart or otherwise.

The form's use of the term "computer" moreover does not define the term in a manner that clearly extends to cellphones. The form does not contain any provision defining the term "computer," and given that the form was drafted in early 2007 the most natural reading of the term "computer" as used in the form is that it refers to traditional desktop or laptop computers—not to cellphones (or for that matter to the ever-growing number of everyday objects, including stoves and refrigerators, that possess computing capacity and computer-like human interfaces).

Other provisions of the Computer Access Agreement, moreover, use language that intentionally applies to a broader category of items than the term "computer" does. Of note, one provision states that "I will not possess any sexually explicit or sexually stimulating materiel in any manner on disk, in computer hard drive, *or any other electronic storage medium* that can hold this type or material." EX. 3 ¶ 8 (emphasis added). Another similarly refers to "any electronic storage

---

[2] *See* https://en.wikipedia.org/wiki/History_of_iPhone.

medium," *id*. ¶ 11, and yet another provision refers to "computer(s) or related equipment." *Id*. ¶ 15. This choice of language demonstrates that the drafters of the agreement were aware that electronic devices existed that did not fall within the scope of the term "computer" but that were relevant for supervision purposes. Perhaps most obviously, "electronic storage medium" would naturally include things like USB drives which could easily hold things like child pornography. More, Apple iPods capable of not only storing but also displaying such images had been on the market since 2004.[3] Mirroring the language above, the suspicionless search condition at issue here easily could have been written to encompass "any electronic storage medium." The provision, however, does not do so.[4] Instead, it applies only to the narrower category of "computer."

The Supreme Court's decision in *United States v. Knights*, 534 U.S. 112 (2001) provides a contrasting example that illustrates the importance of clear and definite language in cases of claimed pre-authorized consent. In *Knights* the Court considered a search condition that stated that the probationer must "[s]ubmit his ... person, property, place of residence, vehicle, personal effects, to search at anytime, with or without a search warrant, warrant of arrest or reasonable cause by any probation officer or law enforcement officer." *Id*. at 114. The Court explained that "The probation

---

[3] *See* https://en.wikipedia.org/wiki/IPod_Classic#iPod_Photo.

[4] Notably, language of this sort was included in a recent order in this district pertaining to the terms of supervised release, which stated that "you shall submit all photographic equipment, personal computers, media storage devices or other Internet-capable devices and related equipment owned, controlled or used by you to a compliance review conducted by the U.S. Probation Office or its designee at a reasonable time and a reasonable manner, without prior notice and without suspicion or search warrant." *See United States v. Arturo Castro*, 2018 WL 441898 at *6 (C.A.2) (brief of defendant-appellant).

In response to a constitutional challenge to the condition, the government agreed that a remand was appropriate. *See* Case 17-2915 (C.A.2) Docs. 29. Following remand on August 7, 2018 (*id*. at Doc.41), the district court ultimately imposed an amended judgment excluding the condition. *See* 3:16-cr-00237-SRU Doc. 79.

8

order clearly expressed the search condition and Knights was unambiguously informed of it. The probation condition thus significantly diminished Knights' reasonable expectation of privacy." *Id*. at 119–20 (footnote omitted).

Here, by contrast, the search condition at issue says nothing about cellphones, smart watches, connected toothbrushes, or any number of devices that lie on the vast spectrum of devices between a Tamagotchi and a teraflop supercomputer. The search provision was far from unambiguous in its application to a cellphone, a device that is referenced nowhere in the Computer Access Agreement and that is colloquially understood to be something different than a computer.

The logic of *Knights* shows that it would not be reasonable to treat an ambiguous document such as the "Probation Computer Access Agreement" as eviscerating all of Ms. Gschlecht's Fourth Amendment rights. The *Knights* decision also highlights a further issue regarding even unambiguous search conditions—namely whether the Constitution *ever* permits suspicionless search conditions. This question (and the Second Circuit's binding answer) is discussed fully below, but it is worth noting that the Supreme Court in *Knights* framed (but declined to answer) this very question, stating:

> We do not decide whether the probation condition so diminished, or completely eliminated, Knights' reasonable expectation of privacy (or constituted consent, see *supra,* at 591) that a search by a law enforcement officer without any individualized suspicion would have satisfied the reasonableness requirement of the Fourth Amendment. The terms of the probation condition permit such a search, but we need not address the constitutionality of a suspicionless search because the search in this case was supported by reasonable suspicion.

*Id.* at 120 n.8.

### IV.     As a Condition of Probation, the Suspicionless Search Provision Is Unconstitutional.

Suspicionless searches of closely held personal information offend many of the bedrock principles developed to protect the Fourth Amendment right of people to be secure from unreasonable government intrusion into their papers and effects. Nevertheless, in a limited set of circumstances, such searches may be appropriate, and in the context of criminal supervision this Court has developed criteria for determining when the "special needs" of supervision warrant such searches.

Specifically, in *United States v. Lifshitz*, 369 F.3d 173 (2d Cir. 2004), this Court addressed the broad question at issue here, namely when and whether the special needs of supervision may justify suspicionless inspection of a supervisee's computer use. *Lifshitz* established that such conditions may be appropriate—but also that they must meet strict criteria. The sweeping suspicionless search condition imposed on Ms. Gschlecht comes nowhere near meeting that standard.

Generally, "special conditions of supervised release implicating constitutionally protected interests" must clear a higher bar. *United States v. Myers*, 426 F.3d 117, 125 (2d Cir. 2005). This Court has articulated that in such circumstances

> we must carefully examine [the condition] to determine whether it is "reasonably related" to the pertinent factors, and "involves no greater deprivation of liberty than is reasonably necessary," 18 U.S.C. § 3583(d), and <u>our application of these criteria must reflect the heightened constitutional concerns</u>.

*United States v. Myers*, 426 F.3d 117, 126 (2d Cir. 2005) (emphasis added) (addressing condition implicating fundamental liberty interest; noting that same analysis applies to conditions involving constitutionally protected interests).

At issue here is the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" enshrined in the Fourth Amendment to the United States Constitution. In this context,

10

> suspicionless searches . . . are highly disfavored since they dispense with the traditional rule that a search, if it is to be deemed reasonable, must be either supported by a warrant based on probable cause, or justified by evidence establishing individualized suspicion of criminal misconduct.

*United States v. Amerson*, 483 F.3d 73, 77–78 (2d Cir. 2007).

Although highly disfavored, release conditions entailing suspicionless searches do not categorically violate the Fourth Amendment. Rather, the jurisprudence of this Court has been that such searches may be lawful if the satisfy a "special-needs test." *Id.* at 78.

The Supreme Court in *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987) articulated the basic principle of this special needs test, holding that warrantless searches may be permitted "when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." *Id.* at 873 (internal quotation marks omitted). The *Griffin* court, in turn, applied this special needs test in the context of a warrantless search of a state probationer. Reasoning that because a state "probation agency must be able to act based upon a lesser degree of certainty than the Fourth Amendment would otherwise require in order to intervene before a probationer does damage to himself or society," the Court concluded that a state probationer could lawfully be searched pursuant to a state regulation allowing a search where there was "reasonable grounds to believe" that a probationer possessed contraband. *Id.* at 879-80.

In *United States v. Lifshitz*, 369 F.3d 173 (2d Cir. 2004), this Court distilled the reasoning of *Griffin* as establishing that "under the 'special needs' doctrine . . . searches for probationary purposes will be upheld if authorized by a law that is in itself reasonable." *Id*. at 181. The *Lifshitz* Court, however, also observed that "*Griffin* does not, however, itself elaborate criteria for determining the reasonableness of a regulation." *Id*. More, because *Griffin* and other cases prior to *Lifshitz* "considered the validity of particular searches, rather than search conditions themselves,"

11

the *Lifshitz* Court was called upon, as a matter of first impression, to address the task of "[evaluating] the conformity of special conditions of probation or supervised release with the Fourth Amendment." *Id*. at 182.

At issue in *Lifshitz* was a special condition of release providing that:

> The defendant shall consent to the installation of systems that enable the probation officer or designee to monitor and filter computer use, on a regular or random basis, on any computer owned or controlled by the defendant. Upon reasonable suspicion, the probation office may make unannounced examinations of any computer equipment owned or controlled by the defendant, which may result in retrieval and copying of all data from the computer(s) and any internal or external peripherals, and may involve removal of such equipment for the purpose of conducting a more thorough inspection.

*Id*. at 177 n.3. Post-judgment clarification confirmed that the intent of the order was that the monitoring described in the first sentence of the order was to occur even absent reasonable suspicion. *Id*. at 178.

The *Lifshitz* court proceeded review "special needs" searches authorized in other contexts. Focusing first on drug-testing conditions authorized by the Supreme Court in the context of public education and public employment, the Court discerned "three principal criteria in assessing whether a 'special need' justifies a search, *id*. at 186, namely:

> [1] First, the government must allege a "special need," the importance of which derives both from the particular context in which it seeks to implement searches—whether that of the vulnerability of school children or the sensitive employment situation of certain customs officials—and what the searches are designed to discover . . . .

> [2] Secondly, those subject to the search must enjoy a diminished expectation of privacy, partly occasioned by the special nature of their situation, and partly derived from the fact that they are notified in advance of the search policy.

> [3] Third, the search program at issue must seek a minimum of intrusiveness coupled with maximal effectiveness so that the searches "bear a close and substantial relationship" to the government's "special needs." [*Id*.]

12

Applying these criteria in the context of computer monitoring as a condition of probation, the *Lifshitz* court held that "[i]n order to comply with the requirements of the Fourth Amendment, the monitoring condition must be narrowly tailored, and not sweep so broadly as to draw a wide swath of extraneous material into its net." *Id*. at 190. Further, although it need not represent the "least intrusive" means of achieving a governmental interest, "the means employed must bear 'a close and substantial relation,' [*Nat'l Treasury Employees Union v. Von Raab*, 489 U.S. 656, 676 (1989)], to the government's interest in pursuing the search." *Id*. at 192.

Applying this standard to the condition at issue, the court observed that the closeness of the fit between the search and the "special need" depended upon the nature of the monitoring. Comparing the condition to the drug screening authorized in other contexts by the "special needs" analysis, the Court explained:

> Constant inspection of the documents that Lifshitz creates on his computer might be more like searching his diary or inspecting his closets than it is like the highly targeted diagnosis accomplished by drug testing. By contrast, software that alerted a probation officer only when Lifshitz was engaging in impermissible communications over e-mail or the Internet would bear much greater resemblance to screening a probationer's urine for particular drugs ….

*Id*. at 191–92 (citation omitted).

In light of the contrasting implications of different monitoring methods, and the fact that "[t]here [was] very little information in the record about what kind of monitoring the probation condition authorizes," *id*. at 190, the *Lifshitz* court concluded that "[t]he scope of the monitoring condition may, therefore, be overbroad, and it is not clear from the record as it stands whether or not monitoring is sufficiently effective to justify its implementation." *Id* at 193. Accordingly, the Court remanded with instruction to the district court to "evaluate the privacy implications of the proposed computer monitoring techniques as well as their efficacy as compared with computer filtering, and then to impose a condition consistent with this opinion." *Id*.

13

Subsequent to *Lifshitz*, the Supreme Court in *Samson v. California*, 547 U.S. 843 (2006), applied a general balancing test—rather than the "special needs" test to determine the validity of a suspicionless search of a parolee. This Court, however, has affirmed that *Lifshitz* remains the governing law with respect to searches of non-parolees. In *United States v. Amerson*, 483 F.3d 73 (2d Cir. 2007), the Court explained:

> [N]othing in *Samson* suggests that a general balancing test should replace special needs as the primary mode of analysis of suspicionless searches outside the context of the highly diminished expectation of privacy presented in *Samson*. . . . Because the Supreme Court has not, to date, held that the expectations of privacy of probationers are sufficiently diminished to permit probationer suspicionless searches to be tested by a general balancing test—and, to the contrary, in Samson the Court expressly acknowledged that probationers have a greater expectation of privacy than the parolees—Samson does not require us to reconsider our holding in *Lifshitz*.

*Id*. at 79. Shortly after *Amerson*, another panel of this Court addressed an appeal that differed from "*Amerson* only in that [the appellants] were sentenced to supervisory release following a period of imprisonment, rather than to probation." *Malvasi v. U.S. Dep't of Prob*., 246 F. App'x 11, 13 (2d Cir. 2007). The panel, in a summary order, observed that "individuals under supervised release have, if anything, a lesser reasonable expectation of privacy than individuals on probation" and that "[t]he analysis in *Amerson* . . . therefore applies with full force to the Appellants herein and its holding determines the outcome of each of these appeals." *Id*.

The broad suspicionless search condition imposed on Ms. Gschlecht comes nowhere close to satisfying constitutional muster as set forth in *Lifshitz*. It is axiomatic that "protection of [one's papers and effects] from state intrusion lies at the heart of the Fourth Amendment." *Florida v. Jimeno*, 500 U.S. 248, 253 (1991). And as the Second Circuit has recognized, "[t]hese Fourth Amendment protections apply to modern electronic data. *United States v. Ganias*, 755 F.3d 125, 135 (2d Cir. 2014). Indeed, in light of the enormous breadth and volume of personal information

14

hard drives contain, the Fourth Amendment may afford even more protection to electronic data files

than to the relatively modest amount of information stored on the "papers" contemplated in the

Constitution:

> Like 18th Century "papers," computer files may contain intimate details regarding an
> individual's thoughts, beliefs, and lifestyle, and they should be similarly guarded against
> unwarranted Government intrusion. **If anything, even greater protection is warranted**.

*Id.* (emphasis added). The proposed search condition, consequently, goes to the heart of the material

protected by the Fourth Amendment.

As discussed above, *Lifshitz* has established standards for determining when a search of this

sort may be permitted absent the specific indicia of criminal wrongdoing typically required by the

Fourth Amendment. The first of these requirements is that the "the government must allege a

'special need,' the importance of which derives both from the particular context in which it seeks to

implement searches . . . and what the searches are designed to discover[.]" *Lifshitz*, 369 F.3d at 186.

As the Supreme Court has recognized, in the context of probation "[s]upervision . . . is a

'special need' of the State permitting a degree of impingement upon privacy that would not be

constitutional if applied to the public at large." *Griffin v. Wisconsin*, 483 U.S. at 875. This "special

need," by definition, must be "beyond the normal need for law enforcement[.]" *Id*. at 873 (quoting

*New Jersey v. T.L.O.*, 469 U.S. 325, 351 (1985) (Blackmun, J., concurring in judgment)).

Put otherwise, if the purpose of a search is to uncover criminal wrongdoing by the person

being searched, then the search cannot be justified by the "special need" doctrine. *See City of

Indianapolis v. Edmond*, 531 U.S. 32, 41 – 42 (2000) (striking down an automobile checkpoint

program "whose primary purpose was to detect evidence of ordinary criminal wrongdoing");

*Ferguson v. City of Charleston*, 532 U.S. 67, 83 – 84 (2001) (hospital program that tested patients

urine for cocaine use unconstitutional because the "immediate objective of the searches was to

generate evidence for law enforcement purposes"). *Cf. Illinois v. Lidster*, 540 U.S. 419, 423 (2004) (highway checkpoint constitutional where purpose was to seek information from potential witnesses, rather than suspect, of crime).

This categorical divide between searches seeking incriminatory evidence and special needs searches is a fundamental precondition of the "special needs" doctrine's existence at all. As this Court has explained,

> [A]s in all cases in which there is a special need, what makes the government's need . . . "special," despite its relationship to law enforcement, is (as a matter of first principles) its incompatibility with the normal requirements of a warrant and probable cause, and, especially, the corollary that the nature of the search involved greatly attenuates the risks and harms that the warrant and probable cause requirements are intended to protect against. As Judge Lynch explained in his concurrence in [*Nicholas v. Goord*, 430 F.3d 652 (2d Cir. 2005)], "special needs" have been found "not because the rules [of warrants and probable cause] are inconvenient to follow," but rather "because in such situations, the rules are not needed to prevent the mischief that they are designed to prevent." Nicholas, 430 F.3d at 680 (Lynch, J., concurring).

*Amerson*, 483 F.3d at 82. The operative word that makes a "special need" search constitutional, that is to say, is not the "need" for effective inspection, but rather the "special" circumstances that place the search beyond the risk of abuse by law enforcement that the framers of the Constitution rightly feared.

In the context of supervision, the "special" justifications articulated in *Lifshitz* are deterrence from further criminal conduct, rehabilitation of the supervisee, and eradication of child pornography. *Lifshitz*, 369 F.3d at 189. With respect to deterrence, the *Lifshitz* court asserted that "there is a high rate of recidivism among sex offenders," *id*., an empirical statement for which the Court relied on *Roe v. Marcotte*, 193 F.3d 72, 79 (2d Cir. 1999) (observing that "defendants cite studies indicating a high rate of recidivism among sexual offenders").

16

The second consideration under *Lifshitz* is that "those subject to the search must enjoy a diminished expectation of privacy, partly occasioned by the special nature of their situation, and partly derived from the fact that they are notified in advance of the search policy." *Lifshitz*, 369 F.3d at 186. Here, Ms. Gschlecht's privacy interests are diminished by her status as a person on Probation—though they are less diminished than would be the case for someone on parole or federal supervised release.

The final consideration is that there must be a close fit between the special need and the search condition:  "the search program at issue must seek a minimum of intrusiveness coupled with maximal effectiveness so that the searches bear a close and substantial relationship to the government's special needs." *Id*. (internal quotation marks omitted). Here, the condition imposed decisively fails the special needs test, far overshooting the mark with respect to intrusiveness and promising minimal, if any, additional deterrence.

With respect to intrusiveness, the proposed condition is nearly the exact opposite of the sort of targeted drug testing that *Lifshitz* held up as a model of acceptable "special need" searches. Instead, the proposed condition, invites potentially extensive—and untargeted— rummaging by Probation officers into the most private and intimate recesses of a person's digital life. It permits Probation officers to inspect in a manner that is, in short, "more like searching his diary or inspecting his closets than it is like the highly targeted diagnosis accomplished by drug testing"— precisely the mode of searching *Lifshitz* warns against. 369 F. 3d at 191.

IV.     **The Search Was Not Otherwise Reasonable.**

The Government bears the burden of showing that any other exception to the warrant requirement justified Ms. Gschlecht's Probation Officer's decision to seize a phone from Ms. Gschlecht and conduct a warrantless search of its contents. Of note in this connection, the Government has provided discovery indicating that on July 30, 2019, another person on state supervision admitted to viewing child pornography with "Michele." The records provided by the Government give no indication that Ms. Gschlecht's probation officer was aware of this statement or that it referred to Michele Gschlecht; indeed, records show that on the day of the search Ms. Gschlecht's Probation Officer conducted and documented a routine GPS monitoring check of Ms. Gschlecht. No reference to the other supervisee's statement appears in that documentation (or in the officer's document of the encounter with Ms. Gschlecht on the green). The officer thus appears to have had no basis for searching Ms. Gschlecht independent of the claimed consent condition.[5]

## CONCLUSION

For the reasons above, all evidence seized from Michelle Gschlecht on July 31, 2019, should be suppressed.

Additionally, because "an evidentiary hearing on a motion to suppress ordinarily is required if the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question," *United States v. Getto*, 729 F.3d 221, 227 n.6 (2d Cir. 2013), the Court should conduct such a hearing prior to ruling on this motion to resolve any factual disputes.

---

[5] Should the Government introduce factual claims in support of an argument to the contrary, Defendant will respond to these in a reply submission.

Respectfully submitted,

THE DEFENDANT,
Michelle Gschlecht

OFFICE OF THE FEDERAL DEFENDER

Dated: January 31, 2020

 s/ James P. Maguire
James P. Maguire
Assistant Federal Defender
265 Church Street, Suite 702
New Haven, CT 06510
Phone: (203) 498-4200
Bar No.: ct29355
Email: James_Maguire@fd.org

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on January 31, 2020, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

s/ James P. Maguire
James P. Maguire

19